No. 59,176

STATE OF KANSAS, *Appellee,* v. STEPHEN T. BISHOP, *Appellant.*

(732 P.2d 765)

Opinion filed February 20, 1987.

*Jessica R. Kunen*, deputy appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the brief for the appellant.

*Daniel F. Meara*, assistant county attorney, argued the cause, and *Robert T. Stephan*, attorney general was with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: Stephen T. Bishop was convicted by jury trial in the district court of Bourbon County of two counts of aggravated assault, K.S.A. 21-3410; and one count each of aggravated burglary, K.S.A. 21-3716; rape, K.S.A. 1986 Supp. 21-3502; and aggravated kidnapping, K.S.A. 21-3421. He was sentenced to serve concurrent terms of three to five years for each count of aggravated assault, five to ten years for aggravated burglary, six to twenty years for rape, and life imprisonment for aggravated kidnapping. Since a firearm was used, sentence was imposed pursuant to K.S.A. 21-4618. The seven points raised on appeal challenge the sufficiency of the information to charge aggravated assault; multiplicity of the rape and aggravated assault charges; failure to instruct the jury on the lesser included offense of attempted rape; the sufficiency of the evidence to support the aggravated kidnapping conviction; the legality of the seizure of a shotgun which was received in evidence; and the propriety of the admission of certain expert testimony and testimony by the victim.

We turn to the pertinent facts of the incident giving rise to these charges. Additional facts will be discussed later as necessary to the issues raised. Gary Johnson and Ms. D lived together in a mobile home in Fort Scott, Kansas, with two minor children. Juanita Puckett is the children's mother; Johnson is the father of the younger child.

Johnson and Ms. D testified that at about 5 o'clock a.m. on March 2, 1985, they were awakened by two men, armed with shotguns, who entered their bedroom and turned on the light.

The men told Johnson and Ms. D not to move or they would be shot. One of the men disconnected the telephone and a CB radio. The men instructed the victims to turn over on their stomachs, and then bound their arms and legs with duct tape. Johnson and Ms. D had never seen either man before.

After the victims were bound, a woman the victims recognized as Juanita Puckett came into the room and struck Ms. D in the head, accusing her of trying to be a mother to Puckett's children. Next, one of the men, later identified as defendant Bishop, stated that they should separate the victims. He instructed the other man, later identified as Buckley Brice, to take Ms. D into the bathroom. She was taken to the bathroom, clad only in her underpants, with her knees, ankles, and wrists bound with tape.

While she was in the bathroom, each of the men came in once in a while and fondled her breasts. At one point, Bishop came in and stayed. He fondled her breasts, made her bend over, and unsuccessfully attempted sexual intercourse. She felt the shotgun against the back of her leg. When Brice came to the door, Bishop zipped up his pants before answering the door. Later, Bishop again attempted to penetrate her and succeeded, penetrating her vagina "a little bit," but he had trouble maintaining the penetration. He ultimately achieved an orgasm outside of the vagina, and ejaculated "all over her." During this time, Puckett banged on the door, shouting, "How does it feel to be raped, Bitch?" Ultimately, Bishop, Brice, and Puckett left. Ms. D freed herself and then freed Johnson. The tires on their van had been slashed and their telephone lines severed. Johnson rewired the CB and called for help. When the police arrived, one officer took Ms. D to the hospital, where a rape kit was administered. Other officers remained at the mobile home and interviewed Johnson and collected evidence. The children were missing.

A warrant was issued for Puckett's arrest. On March 15, 1985, the police were able to trace a phone call made by Puckett to Johnson, to the residence of Janis Monett in Fontana, California. The Bourbon County sheriff's office notified the Fontana police that they had an arrest warrant for Puckett; and that she was at Monett's address in Fontana. The sheriff's office also related the circumstances of the crime and the involvement of two white males who were as yet unidentified.

On March 15, Puckett was arrested at Monett's apartment in Fontana and was later extradited. Bishop was also arrested at the same time, but was released by the Fontana police since no warrant had been issued for his arrest. On April 4, Ms. D identified Bishop as the man who raped her. On May 16, an interview with Puckett confirmed Bishop's involvement, and a warrant was issued for his arrest. Bishop was later arrested in the State of Washington, and Brice was arrested in Orange, California. All three were charged separately in Bourbon County. Puckett pled guilty to aggravated burglary, and Brice was tried on related charges.

Puckett, Bishop, and Brice all testified at Bishop's trial. Their accounts differ one from the other, and they differ materially from the victim's accounts. Puckett testified that she asked Brice and Bishop to come with her from California to Kansas to get her children. This was not in dispute. Prior to leaving, they purchased two shotguns; there was considerable conflict regarding who participated in the purchase. Bishop testified that they took one gun to Kansas, but no one took it into the house. He testified that he saw Brice and Puckett enter the home, and that he followed, but remained in the kitchen. According to Bishop, when Puckett emerged with two bags of the children's clothing, he took the bags to the car at her request. Puckett and Brice then emerged with the children, and they all left. Bishop denied ever seeing Johnson or Ms. D. Brice testified that only Bishop and Puckett entered the residence; he did not. To his knowledge, neither Bishop nor Puckett had any guns with them when they went in. He did not see any guns at all that night. Puckett testified that she and Bishop entered the residence, and Brice followed later. She did not remember any guns being taken into the house. She wrapped each child in a blanket and took them to the car, then packed their clothing and toys in trash bags and carried them out to the car. She did not know what went on in the back of the house.

Janis Monett recalled Bishop giving her a different account of the events. She testified that when Puckett, Brice, Bishop, and the children returned from Kansas, Bishop was "all excited" and related to her how they went in the bedroom, held a gun on the victims, and threatened to blow their heads off. Monett also said

that Bishop told her that they tied up Johnson and his girlfriend and put tape over their eyes and their mouths so that they couldn't make any noises, and that he had separated them by putting the girlfriend in the bathroom.

Apparently the jury accepted the testimony of the victims over that of Puckett, Bishop, and Brice. It convicted Bishop on all counts.

As his first issue, defendant contends that the district court lacked jurisdiction to convict him of aggravated assault because the information was insufficient to charge that offense. K.S.A. 21-3408 defines assault. It reads:

"An assault is an intentional threat or attempt to do bodily harm to another coupled with apparent ability and resulting in immediate apprehension of bodily harm. No bodily contact is necessary."

Aggravated assault is defined by K.S.A. 21-3410. That statute reads as follows:

"Aggravated assault is:

"(a) Unlawfully assaulting or striking at another with a deadly weapon; or

"(b) Committing assault by threatening or menacing another while disguised in any manner designed to conceal identity; or

"(c) Willfully and intentionally assaulting another with intent to commit any felony."

The two paragraphs of the information charging aggravated assault of Johnson and Ms. D are drawn under 21-3410(a). The charges are substantially the same. They read:

"That . . . Stephen Thomas Bishop . . . did then and there unlawfully, feloniously, willfully, and intentionally threaten or attempt to do bodily harm to another, to-wit: Gary L. Johnson [Ms. D] with a deadly weapon, to-wit: a Mossberg 12 gauge pump shotgun, which resulted in the immediate apprehension of bodily harm to the person of said Gary L. Johnson [Ms. D], in violation of K.S.A. 21-3410, a Class "D" Felony, Pen. Sec. K.S.A. 21-4501 and 21-4503."

The words "coupled with apparent ability," included within the definition of assault contained in K.S.A. 21-3408, were not specifically included within the two separate counts of the information charging the aggravated assault. Appellant claims that the omission of this phrase renders the information fatally defective because it amounts to the omission of an essential element of aggravated assault. Appellant relies upon our opinion in *State v. Slansky*, 239 Kan. 450, 720 P.2d 1054 (1986). In *Slansky*,

an aggravated assault charge was drawn under K.S.A. 21-3410(c) (willfully and intentionally assaulting another with intent to commit any felony). The State conceded that its information, which attempted to charge an aggravated assault without using the words "coupled with apparent ability," was fatally defective. There was no charge in *Slansky*, however, that the assault was committed by intentionally threatening or attempting to do bodily harm to another with a deadly weapon, which resulted in the immediate apprehension of bodily harm to that person.

We agree that the information is the jurisdictional instrument on which the accused stands trial, and that an information must allege each essential element of the offense charged. See *State v. Bird*, 238 Kan. 160, 166, 708 P.2d 946 (1985); *State v. Howell & Taylor*, 226 Kan. 511, 513-14, 601 P.2d 1141 (1979). Further, a conviction based on an information which does not sufficiently charge the offense is void. *State v. Bird*, 238 Kan. at 166.

We have frequently held that an information which charges an offense in the language of the statute is sufficient. *State v. Bird*, 240 Kan. 288, 294, 729 P.2d 1136 (1986); *State v. Barncord*, 240 Kan. 35, 726 P.2d 1322 (1986); *State v. Bird*, 238 Kan. 160, Syl. ¶ 3, 708 P.2d 946 (1985). We have also held, however, that the exact statutory words need not be used in the information if the meaning is clear. See *State v. Garner*, 237 Kan. 227, 237, 699 P.2d 468 (1985), and cases there cited. Here, since the exact statutory language is not contained within the information, we must determine whether the language contained within the information reasonably charges the element of apparent ability. Upon a careful reading of the information, we believe that it does. The information charges that the defendant intentionally threatened or attempted to do bodily harm to the victims with a deadly weapon, which resulted in the immediate apprehension of bodily harm by the victims. Since the charge is that the defendant's conduct, with a shotgun, placed the victims in the immediate apprehension of bodily harm, we hold that apparent ability was obvious and aggravated assault was sufficiently charged.

Defendant next claims that the aggravated assault charge pertaining to Ms. D is multiplicitous to the charges that he raped her and that she was the subject of aggravated kidnapping. We

discussed the concept of multiplicity at length in *State v. Garnes*, 229 Kan. 368, 372-73, 624 P.2d 448 (1981). We said:

"Multiplicity in criminal pleading is the charging of a single offense in several counts. . . . Multiplicity exists when the State attempts to use a single wrongful act as the basis for multiple charges. The general principles for determining whether charges are multiplicitous are these:

"(1) A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution.

. . . .

"(2) If each offense charged requires proof of a fact not required in proving the other, the offenses do not merge.

. . . .

"(3) Where offenses are committed separately and severally, at different times and at different places, they cannot be said to arise out of a single wrongful act."

In the case at bar, the kidnapping charge is based on a taking or confinement of Ms. D by force or threat, done with intent to hold her to facilitate flight or to inflict bodily injury, and that bodily harm was inflicted upon her. The rape charge is based on nonconsensual sexual intercourse, committed under circumstances when Ms. D was overcome by force or fear. Bishop reasons that his possession and use of a gun was significant in establishing the force element in both the rape and the kidnapping charges, and cannot also provide the basis of the aggravated assault.

We held a charge of aggravated assault to be multiplicitous with kidnapping in *State v. Racey*, 225 Kan. 404, 408, 590 P.2d 1064 (1979), and rape in *State v. Lassley*, 218 Kan. 758, 761-62, 545 P.2d 383 (1976). In both cases, however, the court found a single, continuous act. In *Lassley*, the victim was accosted in the living room of a home where she was babysitting. Lassley ordered her outside, grabbed her by the hair, pushed her down an alley, held a knife to her throat, took her to some nearby shrubs, and raped her. We held that the defendant's conduct constituted a single continuous transaction, a situation where there was a continuous act of force on the part of the defendant. We distinguished that case from *State v. James*, 216 Kan. 235, 531 P.2d 70 (1975), where there was a break in the action—an assault at one place and a subsequent rape at another. The facts in *Racey* are

somewhat similar to those in *Lassley*. Racey continually threatened the victim with a gun throughout the entire sequence of events. There was one continuing unbroken act of force. Thus, we concluded that Racey could not be convicted of both aggravated assault and kidnapping.

The facts in the case at hand are distinguishable from *Racey* and *Lassley*. Here, as in *James*, there was a significant break in the action. The aggravated assault was completed when the defendant and Brice entered the bedroom, pointed shotguns at the victims, and threatened to blow their heads off if they didn't do as they were told. The victims were then bound with tape. Ms. D was taken, bound and by force, into the bathroom. One at a time, Brice and Bishop would come into the bathroom and fondle her. Still later, she was raped by Bishop, her resistance overcome by force or fear. The offenses of aggravated assault, taking and confining, and the subsequent rape were separate and distinct. The offenses occurred at separate times and in separate places. They were not a part of a single, continuous act, as in *Lassley* or *Racey*. There was no use or threatened use of the guns during the kidnapping or the rape. Since the offenses were not part of a single continuous act, we hold that the aggravated assault is not multiplicitous with the kidnapping or the rape.

Bishop contends that the trial court erred by refusing his request for an instruction on the lesser included offense of attempted rape. The victim testified that the defendant penetrated her vagina "a little bit." Mere contact of the sexual organs is not sufficient to establish rape. *State v. Grubb*, 55 Kan. 678, 41 Pac. 951 (1895). Proof of actual penetration is necessary. However, even the slightest penetration is sufficient. *State v. Korbel*, 231 Kan. 657, 659, 647 P.2d 1301 (1982); *State v. Ragland*, 173 Kan. 265, 246 P.2d 276 (1952). The victim's testimony was sufficient to establish penetration. There was no evidence to show that rape was attempted but not accomplished. The defense was that the defendant was not in any area of the house but the kitchen, and that he did not have any contact, let alone intercourse, with Ms. D.

The trial court has an affirmative duty to instruct the jury on all lesser included offenses established by the evidence. See K.S.A. 1986 Supp. 21-3107(3). This duty arises, however, only when

there is evidence under which the defendant may reasonably be convicted of the lesser offense. *State v. Everson,* 229 Kan. 540, 542, 626 P.2d 1189 (1981). There was no evidence here upon which the defendant could reasonably have been convicted of attempted rape, and the trial court did not err in refusing defendant's request for that instruction.

Bishop contends that the evidence does not support the conviction of aggravated kidnapping because the movement was merely incidental to the crime of rape, to the bodily harm, and to the defendant's flight from the trailer. Defendant relies upon the test set forth in *State v. Buggs,* 219 Kan. 203, 216, 547 P.2d 720 (1976), where we said:

"[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;

"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

"For example: . . . The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is."

In *State v. Bourne,* 233 Kan. 166, 660 P.2d 565 (1983), two small daughters of the victimized family were first brought to the master bedroom where their parents were tied up. The girls were then taken, separately, to an adjoining bedroom where one was raped and the other was later manually assaulted. Defendant contended this movement did not constitute kidnapping under *Buggs.* We disagreed, saying:

"Moving each little girl into another room and away from her parents, her brother, and defendant's accomplice, so that none of them could see or interfere with defendant's acts, was sufficient movement to constitute kidnapping." 233 Kan. at 168.

Similarly, in *State v. Chears,* 231 Kan. 161, 643 P.2d 154 (1982), we rejected the defendant's *Buggs* argument. The three victims were first made to lie on the living room floor. Later, one of the armed men removed the adult female victim from the living room to a bedroom where he attempted intercourse and then

forced the victim to commit sodomy. We found that the removal of the victim from the view of all the other occupants, insuring that there would be only one witness to the sodomy, and preventing others from interfering with and witnessing the crime, was sufficient to constitute kidnapping.

In the case at bar, the victim was initially bound with tape in the presence of her boyfriend. She was clad only in underpants. Present in the home, in addition to the victim and her boyfriend, were two small children and the three intruders. The victim was moved to a bathroom where the door was closed. Both Bishop and Brice entered that room, separately, to fondle the victim, and Bishop took precautions to conceal his act from the others. The removal of the victim to the bathroom was certainly not for the comfort and convenience of the rapist, nor was that movement merely incidental to the crime of rape. The removal and confinement of the victim hid her from the eyes of all others present, except the defendant, during the time of the rape. The separation of the victims also facilitated the escape of the intruders. We hold that the evidence was sufficient to support the conviction of aggravated kidnapping.

Bishop next contends that a shotgun, received in evidence, was illegally seized and held by California police officers in violation of his Fourth Amendment right under the United States Constitution, and Section 15 of the Bill of Rights of the Kansas Constitution, and should have been suppressed. Both constitutional provisions prohibit unreasonable searches and seizures. The wording and the scope are identical for all practical purposes. If conduct is prohibited by the one, it is prohibited by the other. See *State v. Fortune*, 236 Kan. 248, Syl. ¶ 1, 689 P.2d 1196 (1984); *State v. Deskins*, 234 Kan. 529, 531, 673 P.2d 1174 (1983); *State v. Wood*, 190 Kan. 778, 788, 378 P.2d 536 (1963).

The factual background of the seizure is as follows. A warrant was issued for the arrest of Juanita Puckett, and a detective of the Fontana, California, police department was present at the time of her arrest at the apartment of Janis Monett in Fontana. The detective was informed that a Kansas warrant had been issued for Puckett's arrest and that two unknown males, believed to be armed and dangerous, were also involved in the underlying crime. Puckett and Bishop were among the occupants of the

residence when the police arrived. Both Bishop and Puckett were arrested. Bishop was released later that day, since there was then no outstanding warrant for him. Janis Monett, the person in whose apartment Bishop and Puckett were arrested, returned home while the officers were still there. She informed the police that there was a gun in a duffel bag in the kitchen. The detective went to the bag, stood over it, and looked in. The bag was open at the top. The detective saw a pistol grip of a shotgun when he looked down into the bag. Monett asked the officer to remove the property belonging to Bishop and Puckett from her apartment. He did so. The property was taken to police head-quarters and inventoried. Later that same day, the detective learned that guns were used in the crime under investigation, and the weapon was therefore retained by the Fontana police. It was later delivered to Kansas officers, and was received in evidence at trial.

Bishop testified at the suppression hearing that the duffel bag was closed and locked with a master lock, and that the bag contained only his property and that of his son. He was not asked specifically if the shotgun was his. At trial, however, he testified that the gun did not belong to him and that he was not present when it was purchased, but Juanita Puckett had brought it home from the sporting goods store and had shown it to him. It was still in a box with the barrel unattached. He testified the gun be-longed to Juanita Puckett.

At the close of the suppression hearing, the trial court denied the motion to suppress, ruling that the officers were lawfully present pursuant to an arrest warrant for Puckett; they appropri-ately secured the premises by moving to the location of the weapon; the bag was open and the gun was in plain view; Bishop was removed from the apartment for police business pursuant to an ongoing investigation; the department had a policy to remove the property of a person who is removed from an apartment of which they are not a legal tenant if the legal tenant requests such removal; and the gun was seized pursuant to that policy and retained after receipt of additional information regarding the possible involvement of shotguns in the crime under investiga-tion.

The trial court, on disputed evidence, found that the duffel bag

was open and the gun was in plain view. That finding of fact is supported by the evidence. The gun was not secreted in a particular room or area occupied by Bishop; it was in plain view in the kitchen of the apartment. The seizure of the weapon was undertaken at the request of Monett, the tenant in the apartment. The item was not seized as a result of a search, but was seized at the request of the rightful tenant of the apartment.

The Constitution prohibits only unreasonable searches and seizures. *Harris v. United States*, 331 U.S. 145, 150, 91 L. Ed. 1399, 67 S. Ct. 1098 (1947). One moving to suppress evidence has the burden of proving not only that the search was illegal, but also that he or she had a legitimate expectation of privacy in the place from which the property was seized. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980). Ownership of the property is one of the factors to be considered in determining whether an individual's Fourth Amendment rights have been violated, but an illegal search violates only the rights of those who have a legitimate expectation of privacy in the invaded place. *Rakas v. Illinois*, 439 U.S. 128, 143, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978), quoted in *United States v. Salvucci*, 448 U.S. 83, 91-92, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980). Also, one whose right of privacy of person or premises has not been invaded by the seizure of property has no right to object to that property being used as evidence. *Wong Sun v. United States*, 371 U.S. 471, 492, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

Monett told the detective where the shotgun was located, and she asked him to take it out of her apartment. Did Bishop have a reasonable expectation of privacy in the duffel bag? Under the circumstances, we think not. The bag was located in the kitchen of the apartment, obviously a common area open to all who were in the apartment. The duffel bag was open, and thus the shotgun was in full view of persons in the apartment. The weapon did not belong to Bishop; Juanita Puckett had purchased it, had brought it home, and had full ownership of it. Bishop had no ownership interest in it. Puckett was lawfully arrested and taken into custody on an outstanding felony warrant. Her property, including the shotgun, was taken from the apartment by the officers at the request of the tenant. Under these facts, we hold that Bishop had no standing to challenge the seizure of the shotgun and no valid

objection to its receipt in evidence. The inventory of the weapon and the ammunition it contained, and the retention of the gun by the Fontana police, did not violate any of Bishop's constitutional rights. The trial court did not err in admitting the shotgun into evidence.

Next, defendant contends that prejudicial error was committed when the examining physician testified that in his opinion the victim had been sexually assaulted. There was no objection to this testimony at trial. It is a familiar rule, codified in K.S.A. 60-404, that a judgment may not be reversed by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of the objection. Appellant relies on *State v. Puckett*, 230 Kan. 596, 640 P.2d 1198 (1982), in urging us to consider the issue even though no objection was made at trial. *Puckett*, however, was concerned with error in jury instructions, not the erroneous admission of evidence. Further, the error in *Puckett* was considered to be so extreme as to present a high likelihood that defendant's constitutional right to a fair trial was denied. 230 Kan. at 597-98.

In *State v. Bressman*, 236 Kan. 296, 303, 689 P.2d 901 (1984), we held that the trial court committed prejudicial error in permitting an examining physician to testify that in her opinion the victim had been raped. In *Bressman*, however, there was a specific trial objection to the testimony of the witness. Additionally, there was abundant evidence here, aside from the testimony of the examining physician, to support the jury's verdict that Ms. D was raped and that she was raped by the defendant. The expert did not testify, as in *State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985), that the victim had been sexually molested by the defendant, or, as in *State v. Jackson*, 239 Kan. 463, 721 P.2d 232 (1986), that the victim was telling the truth and had been sexually abused by the defendant. The inquiries in *Lash* and *Jackson* go one step beyond the present issue, in that they specifically sought to prove that the defendant performed the alleged acts upon the victim. Here, in light of the specific testimony by the victim and by Gary Johnson, as well as the testimony disclosing the factual findings of the examining physician, we hold that the admission of this evidence, while error, would not, if

excluded, have resulted in a different verdict. We see no reason to depart from the rule laid down in K.S.A. 60-404.

Finally, the defendant contends that the trial court committed prejudicial error by permitting the victim to testify that she received counseling as a result of what happened to her on March 2, 1985. It has long been recognized that rape is a crime which often results in psychological as well as physical injury. Our approval of evidence of the rape trauma syndrome is illustrative. *State v. McQuillen*, 236 Kan. 161, 689 P.2d 822 (1984); *State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982). With this in mind, allowing the rape victim to testify that she sought and received counseling is not unlike allowing the assault and battery victim to testify that he or she sought and received medical attention for physical injuries sustained. The victim was asked specifically whether she had sought counseling as a result of what happened to her on March 2. She responded that she had. As with other criminal offenses, rape may be proved by circumstantial evidence. The victim's testimony that she received counseling as a result of what happened to her is merely circumstantial evidence that she was raped. We have reviewed the authorities cited by the defendant, but find they are distinguishable. Under the circumstances here disclosed, we conclude that the trial court did not err in admitting this evidence.

The judgment is affirmed.